**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **AMELIA MUNOZ** | § | |
| | § | |
| **v.** | § | **A-09-CA-738-LY** |
| | § | |
| **HILL COUNTRY MEMORIAL** | § | |
| **HOSPITAL** | § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO:    THE HONORABLE LEE YEAKEL
        UNITED STATES DISTRICT COURT

Before the Court are: Defendant's Motion for Summary Judgment filed June 11, 2010 (Clerk's Doc. No. 17); Plaintiff's Response and Brief in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment filed June 22, 2010 (Clerk's Doc. No. 18); Defendant's Response to Plaintiff's Response to Defendant's Motion for Summary Judgment filed July 6, 2010 (Clerk's Doc. No. 21); Plaintiff's Motion for Leave to File Sur-Reply filed July 9, 2010 (Clerk's Doc. No. 22)[1]; and Defendant's Response to Plaintiff's Motion for Leave to File Sur-Reply filed July 12, 2010 (Clerk's Doc. No. 23).  The District Court referred these motions to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(A), Federal Rule of Civil Procedure 72, and Rule 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges.  After reviewing the parties' briefs, relevant case law, as well as the entire case file, the undersigned submits the following Report and Recommendation to the District Court.

---

[1]According to Local Rule 7(e) for the Western District of Texas, the Court does not accept submissions after a reply without authorization.  Because the Sur-Reply simply restates the arguments already contained within Plaintiff's response, the Court DENIES Plaintiff's Motion for Leave to File Sur-Reply (Clerk's Doc. No. 22).

# I.  INTRODUCTION

The Court's review of this summary judgment motion was made difficult by the very scattershot approach to the facts Munoz took in her response to the motion.  In the pleading, Munoz points to a host of events that she perceived as discriminatory, and, without differentiating between her various claims, relies on all of these events to support her claims of age, race, and national origin discrimination.  Things are further complicated by counsel's confusion of her clients.  Counsel has filed two similar actions against Hill Country Memorial Hospital: the instant case, and the case styled *Dora Bustamante v. Hill Country Memorial Hospital*, No. A-09-CA-745 LY.  In numerous instances throughout the discussion of the facts of this case, counsel refers to events that took place involving Bustamante as though Bustamante is the plaintiff is this case, without any apparent recognition that she is discussing the wrong client.

As a result of these issues, the Court has found it a struggle to make sense of exactly what the facts of this case are.  Indeed, many—if not most—of the allegedly discriminatory events are not placed in any particular time frame, making it impossible for the Court to know for certain that it has a correct chronology of events.  Nevertheless, the Court has done the best that it could from the record before it to determine when the various alleged events took place.  Finally, although the briefing does not follow this approach, the Court will examine the claims by the cause of action pled, rather than the factual event complained of, as this allows for a more precise analysis of the legal issues before the Court.

Plaintiff pleads five causes of action in her complaint: (1) Title VII discrimination, (2) Title VII retaliation, (3) violation of 42 U.S.C. 1981, (4) age discrimination under the ADEA, and (5) intentional infliction of emotional distress.  Ultimately, when the factual arguments are

considered, Munoz is claiming that: (1) she was subjected to a hostile work environment; (2) she was disciplined differently than others; (3) she was retaliated against for filing her EEOC charge; (4) she was passed over for promotions or transfers; and (5) she suffered intentional infliction of emotional distress.  While this is never explicitly addressed in the response, it appears that the hostile work environment and disparate treatment claims rely on allegations of both age and race discrimination.[2]

## II.  SUMMARY JUDGMENT EVIDENCE

### A.      Summary Judgment Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c);  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508.  Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

---

[2]Munoz also claims she was discriminated against because of her national origin.  But she—and the rest of her family—were born in Fredericksburg, Texas.  Deposition of Munoz at 19:25–20:7.  The Court therefore assumes (as the Hospital does in its brief) that this is intended to be a claim of racial, not national origin, discrimination.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary-judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary-judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary-judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

### B.     The Undisputed Facts

For the most part, the facts underlying the various incidents on which this case is based are not disputed, although the parties' perceptions of the events obviously differ. In setting out the evidence, the Court will focus on the facts of each of these incidents, and attempt to put them into context (something the parties' briefing did not do well).

Plaintiff Amelia Munoz has worked at Hill Country Memorial Hospital since 2001 and is currently a Patient Account Representative.  This is the second time she has worked for the Hospital. She originally worked there from 1990–1995.  During her current tenure, Munoz and her coworkers in the small business office have occasionally clashed.  Munoz alleges that these incidents result from her coworkers' race and age-based discrimination.

### 1.    Facts related to hostile environment claim

Munoz details several incidents that she found discriminatory in her work environment. First, she claimed that while her younger, white colleagues received help more readily than her, her requests for help were denied.  Deposition of Amelia Munoz at 31:6–32:21.

Munoz also alleges that her coworkers used racial remarks, both towards her and towards Hispanic patients.  She claims that a coworker, Sue Klinsiek, told her that "because you're a Mexican you get paid more." *Id.* at 36:18–20.  Munoz claims that Klinsiek told her that she was paid more because she was a Mexican "several times." *Id.* at 38:11–25.  Munoz complained about this to her supervisor, however, and Klinsiek was counseled and told to bake a cake as an apology. *Id.* at 37:15–24.  Munoz also complains that when a customer needing Spanish translation assistance approached the desk, Klinsiek would say "[t]here's a Mexican here, we need Spanish speaking." *Id.* at 36:22–23.  Munoz found Klinsiek's use of "Mexican" derogatory. *Id.* at 37:11–13.  She complained to several supervisors but alleges that "[n]othing was ever done." *Id.* at 38:1–10.

Suzanne Hartmann, the business office director, testified that, in the context of discussing whether a patient qualified as indigent, Klinsiek made a comment that an Hispanic patient could get a job at McDonald's.  Deposition of Suzanne Hartmann at 116:19–117:5.  Hartmann stated that she verbally warned Klinsiek that such a statement was inappropriate. *Id.* at 118:4–15.  There was no

evidence that Munoz was present when Klinsiek made this comment.  Later, Hartmann heard Klinsiek use the term "wetback," and as a result gave Klinsiek a final written warning.  *Id.* at 119:11–120:10.   Again, this comment was not directed at Munoz, nor was Munoz present when it was made.  Subsequently, Dora Bustamante, a coworker, came to Hartmann and said that Klinsiek had sprayed the waiting area with air freshener after a Hispanic patient left and said "your people smell."  *Id.* at 123:11–16.  Hartmann investigated the remark and determined that Klinsiek actually said "those people smell," and concluded that the remark, while impolite, was not racially motivated. *Id.* at 124:2–16, 126:2–17.   Hartmann's conclusion was supported by a witness to the incident—Lucinda Lofton, a Hispanic coworker—who stated that Klinsiek did not say that "your people smell."  Deposition of Erin Cates at 54:7–23.  Once again, Munoz was not present when the remark was made.

Munoz also contends that one of the Hospital's receptionists, Nita Regester, would ask Hispanic patients if they needed "Spanish speaking."  Munoz at 40:23.  Munoz claims that Regester would also ask Hispanic children if they would like ice cream, get them excited, and then give them a sticker that said "ice cream.".  *Id.* at 41:2–12.  But Munoz admits in her testimony that she does not know if Regester also similarly teased white children.  *Id.* at 44:20–45:7.  Munoz only observed Regester interact with children around five times.  *Id.* at 42:21–22.

Munoz also contends that she was discriminated against when she was told to clean up a table in the break room where someone had left some trash (apparently one or more sugar packets).  *Id.* at 117:23–118:9.  Munoz believed that she was called out to clean up the table because of her race, but Hartmann testified that it was Bustamante—not Munoz—who was upset about this event because Hartmann praised a coworker for cleaning the break room and did not mention Munoz's role

in helping clean.  Hartmann at 139:1–19.  Bustamante later admitted to Hartmann that she, Munoz,

and another coworker had left the sugar packets in the break room.  *Id.* at 140:5–8.

Finally, Munoz claims that the Hospital inappropriately monitored her, requiring her to create

a daily log of "all the calls, all patients I saw, anything; my lunches were monitored, when other

Anglos were able to go freely . . . .  I did ask my coworker, I said, 'What are you putting in your daily

log?' She said, 'I'm not, I'm not required to do this.'"  *Id.* at 98:23–99:5.  But when Munoz

questioned her manager if only she had to fill out a daily log, the manager told her that "[e]veryody

else is doing it" and this was confirmed with a subsequent email that said "everybody is supposed

to do a daily log."  *Id.* at 100:17–24.  This was confirmed by Porter, who testified that all of the

business department employees have to keep a daily work log.  Porter at 87:3–6.  The policy was

never applied solely to Munoz.  *Id.* at 88:16–20.  All patient account representatives were required

to log what they did and report to their supervisors when they were leaving the business department.

*Id.* at 89:17–90:9.[3]

## 2.      Facts related to disciplinary actions

It is not clear whether Munoz relies on allegations relating to disciplinary actions solely for

an independent claim of disparate treatment (this is the most logical reading of her brief), or whether

she also relies on these facts as part of her hostile environment claim.  In her brief, she compares her

treatment to that of Klinsiek, suggesting that Klinsiek was treated less harshly because she was

white.  In its analysis, the Court will consider these facts for both the hostile environment and

disparate treatment claims, but sets them out separately here for clarity's sake.

---

[3]Munoz also complained that she once tried to open her daily log and it was being viewed
by her supervisor Jane Hazelett; to her, this also constituted discrimination.  Munoz at 103:18–22.

Munoz had two incidents in October 2008 that resulted in her being reprimanded, first orally, and then in writing. The first incident took place sometime in the first half of October, when Munoz argued with a coworker, Dawn Lantz. Munoz believed that Lantz had falsely accused her of sending out letters to patients saying that the Hospital provided free services. Munoz at 51:17–20. Munoz testified that her supervisor, Melissa Porter, did not allow Munoz to explain her side—and believed Lantz's version without investigation. *Id.* at 52:6–13. The facts actually demonstrate more than this. Porter testified that Munoz came to her requesting that she resolve a dispute between Munoz and Lantz, but when Munoz and Porter approached Lantz's desk, Munoz "verbally attacked" Lantz, using an accusatory tone, and speaking so rapidly that Lantz was not able to get a word in. Deposition of Melissa Porter at 109:22–111:7. Porter viewed Munoz's actions as inappropriate both in tone and because she felt that Munoz having Porter present for the tirade could have given Lantz the impression that Porter condoned or supported Munoz's actions. *Id.* As a result of this, Porter verbally counseled Munoz and expressed that she thought Munoz's actions were inappropriate. *Id.* at 111:9–15. Munoz admits that Porter was present during the argument. Munoz at 54:3–21.

Not long after this, on October 15, 2008, Munoz was reprimanded in writing and suspended with pay. She complains that this reprimand was not justified, and was, like the prior incident, evidence of discrimination. Once again, Munoz's description of the event in her brief is not consistent with the summary judgment evidence. The incident arose when Munoz made a gesture to Bustamante that was taken by those who witnessed it as insinuating that a co-worker, Penny Czaja, was not where she was supposed to be. *See* October 15, 2008 memo of Porter. Czaja was impacted by the event sufficiently that she was in tears about it and informed Porter that she did not want to work with people who treated her that way. Porter at 128:3–7. Porter viewed the incident

8

as serious because it came on the heels of the incident with Lantz, and also because prior to this she had received complaints about Munoz's attitude from three employees (Rafiq, Lantz, and Czaja). *Id.* 103:2–104:9. The result of this incident was that Munoz was told to take the rest of the week off (with pay), a written memo of the event was prepared, and Munoz was required to write an action plan for her return to work, and to apologize to Czaja, an apology she was to rehearse for Porter. She was also removed from Partners in Caring—a committee made up of employees who model the standards of behavior expected of Hospital employees. Munoz at 71:22–72:11; Porter at 85:7–12. Thus, while Munoz suggests in her brief that she was suspended for nothing more than shrugging her shoulders, the undisputed evidence demonstrates that instead she was disciplined for a pattern of behavior she had been exhibiting over a several week period, which had resulted in complaints from several coworkers, and some of which was witnessed by her supervisor.[4]

Further, the summary judgment evidence demonstrates that Munoz is not the only employee who has received reprimands for a bossy or insubordinate attitude. Donna Braudway, a white coworker, was fired by Hartmann for her insubordinate and negative attitude around the office. Hartmann at 47:7–49:14. And in that case, Hartmann did not actually observe the interactions—she relied on the complaints of Lantz and Bustamante. *Id.* at 48:19–49:18. So Braudway, a white coworker who received similar complaints as Munoz, was terminated after her manager believed the

---

[4]Munoz claims that Porter also told her that she would sit next to her for several months and observe her as part of her punishment. Munoz at 65:4–9. There was no mention of this in the written reprimand, although Porter testified that she did share an office with Munoz (and one other patient account representative) for several months, but the purpose was not to monitor Munoz. Porter 36:19–23. This was not the first time Porter had shared an office with a patient account representative, as she had previously shared an office with Donna Braudway. *Id.* at 38:1–7. Porter also testified that the reason for sharing the office was it was the only available workstation. *Id.* at 91:7–25. There is no evidence to contradict this.

9

word of her Hispanic coworker.  Braudway had previously received a written reprimand.  *Id.* at 53:8–10

**3.     Facts related to retaliation claim**

Munoz filed her EEOC complaint on October 16, 2008.  She amended the complaint on January 29, 2009, to allege that she believed the Hospital had retaliated against her for filing her complaint by giving her an evaluation stating that she needed improvement.  Exh.B to Motion for Summary Judgment. In December of 2008, Munoz's manager reported to her that one of her coworkers, Christa Rafiq, complained about Munoz being bossy towards her.  Munoz at 91:11–93:2. Munoz admits that "that word always keeps on coming up, 'bossy,'" but that the Hospital was manufacturing complaints as retaliation for Munoz's EEOC complaint.  *Id.* at 91:21–93:2.  On Munoz's subsequent performance evaluation, these incidents, including those in October 2008, were referenced.  Because Munoz believed that the complaints were false, she refused to sign her evaluation.  *Id.* at 93:8–17.  The record does not contain the entire evaluation (only two pages are included), so it is difficult to fully evaluate this claim.  There is no dispute, however, that Munoz received a 2.5% merit-based raise after the evaluation, and the only negative comments mentioned in the evidence were criticism about her interactions with coworkers and suggestions that she exhibit more professionalism in her emails.  *Id.* at 94:8–15.

**4.     Facts related to failure to promote or transfer**

Munoz complains that she was not transferred to what amounted to parallel positions on two occasions.  *Id.* at 15:11–17, 21:5–23:10.  She was not given these transfers, on one occasion (according to Munoz), because her supervisor told her that too many managers had complained about

her. *Id.* at 22:24–23:9.[5]  Munoz did ask for and receive a lateral transfer from one type of patient account representative to another type of patient account representative that dealt more with motor vehicle accident accounts.  *Id.* at 107:22–109:3.  She did not formally apply for the position—she just asked her supervisor for the change in responsibilities.  *Id.* at 109:4–5.

In addition to not being transferred, Munoz also complains that she was not able to apply for an officer manager position because the Hospital did not post the position, but simply hired someone for the job.  While Munoz never applied for a management position, she points to two occasions where a business office manager was hired without the Hospital soliciting applications.  Munoz, 27:20–25.  The summary judgment evidence indicates, however, that at least on one of these occasions, there were applications solicited.  Porter at 43:20–46:13.

## IV.  ANALYSIS

For the federal claims, both parties' arguments do not generally differentiate between the age, race, and § 1981 claims.  Accordingly, the Court will follow suit and address the applicable claims of discrimination jointly, while highlighting whenever it is addressing issues unique to a particular cause of action.  This merging of the issues is partly due to the facts—in many of Plaintiff's allegations, she alleges discrimination without specifying if it is based on race or age—and partly because of the similarity in analysis for these types of claims.

Title VII prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2a (2006).  The ADEA makes it unlawful "for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate

---

[5]Hartmann admits that she told Munoz that managers had complained about her but denies that it was a reason provided to deny her transfer.  Hartman at 114:4–115:4.

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1) (2006).  Discrimination claims—including claims under Title VII, section 1981, and the ADEA—are all subjected to the same burden-shifting framework promulgated in *McDonnell Douglas Co. v. Green*, 411 U.S. 792 (1973).  *See Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002) (applying *McDonnell* to section 1981); *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 449 n.5 (5th Cir. 1996) (applying *McDonnell* to the ADEA).

Under this analysis, "the plaintiff must [first] establish a prima facie case of discrimination." *Reeves*, 530 U.S. at 142.  This requires Plaintiff to satisfy four elements: (1) she belongs to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by someone outside her protected class or similarly situated employees outside her protected class were treated more favorably under nearly identical circumstances. *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004).  Under the *McDonnell* framework, once the plaintiff asserts a prima facie case of discrimination, "the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglass Co.*, 411 U.S. at 802.

## A.      Hostile Work Environment Claim

### 1.      Procedural bar issues

Before addressing the merits of Munoz's allegations, the Hospital argues that many of the events giving rise to her hostile environment claim should not be considered, because either they were not contained in her EEOC complaint or they took place too long ago.  The general rule is that if the allegations in the complaint are of the same type as those contained in the EEOC complaint,

12

then a defendant is considered to be on notice of the allegations and they may be considered.  *See*

*Fellows v. Universal Rests. Inc.*, 701 F.2d 447, 448 (5th Cir. 1983) (reversing the district court's

dismissal based on incidents not mentioned in the plaintiff's EEOC filings "because the initial

charges of discrimination before the EEOC were sufficiently like or related to those asserted . . . to

support a Title VII cause of action").  This rule prevents plaintiffs from having to include every

possible incident in their complaint to avoid being barred from raising it in their subsequent suit.

"Title VII employment discrimination may be based, not only upon the specific complaints made by

the employee's initial EEOC charge, but also upon any kind of discrimination like or related to the

charge's allegations."  *Id.* at 451.  While Munoz did not include in her EEOC complaint every

incident that she now relies on for her hostile environment claim, the incidents not disclosed

sufficiently resemble those she did include that it is appropriate to consider them.

The Hospital also complains that Munoz relies upon incidents for the hostile environment

claim that are barred by the statute of limitations.  EEOC complaints must be filed within 300 days

of a violation.  Section 1981 claims must also be timely brought with state law providing the statute

of limitations.  *See Johnson v. Railway Express Agency*, 421 U.S. 454, 463–66 (1975) ("Federal civil

rights actions brought under section 1981, which lack an express statute of limitations, are governed

by the most closely analogous limitations period provided under state law.").  Under Texas law, one

must file a discrimination claim under section 1981 within two years of the adverse employment

action."  *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 278 (5th Cir. 2004).

This time period may be tolled under certain conditions, and hostile work environment is

one of the excepted circumstances.  Munoz alleges that—at least with regard to the hostile

environment claim—the Hospital's actions should be considered a continuing violation.  The

13

Supreme Court held that hostile environment claims "will not be time barred so long as all acts which constitute the claim are part of the same unlawful practice and at least one act falls within the time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Plaintiffs have two ways of proving a continuing violation: (1) producing evidence of a series of discriminatory acts, or (2) demonstrating that the defendant has a policy of discriminating. *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 475 (5th Cir. 1989). The events need not be constant. "[G]aps between the specific incidents . . . do[ ] not demonstrate a lack of continuity." *Id.* at 476. A hostile environment claim usually involves a continuing violation. *Id.* To determine whether the environment was hostile, the court should review the pattern and frequency of the harassment. *Id.* Additionally, the court should see if the employer tolerated employee harassment or whether appropriate action was taken. *Id.* at 479. For the continuing violation doctrine to apply, the plaintiff "must demonstrate more than a series of discriminatory acts. He must show an organized scheme leading to and including a present violation." *Huckabay v. Moore*, 142 F.3d 233, 239 (5th Cir. 1998). For the purposes of this motion, the Court will assume that Munoz has sufficiently alleged a continuing violation such that all of her complained-of actions may be considered.

**2.      The merits of the hostile environment claim**

Munoz has worked for the Hospital for over 14 years. She has apparently been happy there the majority of this time.[6] Now that this suit has been filed, however, she has identified a host of events which she contends demonstrate the existence of a hostile work environment. The Court has set out the summary judgment evidence on these events above.

---

[6]Her charge of discrimination alleges that the discrimination began on December 21, 2007.

To maintain a suit for a hostile work environment, Plaintiff must demonstrate that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–67 (1986)).   To make a prima facie hostile environment claim, a plaintiff must prove four elements: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on her age, race, or national origin; and (4) the harassment affected a term, condition, or privilege of her employment.   *Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003).

The environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22 (1993)).   This requires the Court to "determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 787–88 (citations omitted).   Only substantial and serious incidents violate Title VII.   Minor incidents like "teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* at 788.   This allows courts to "filter out complaints attacking the ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* (citations omitted).

It is important to keep in mind that Title VII does not provide relief from offensive comments unless they permeate and affect the work environment. Recently, the Fifth Circuit held that supervisors calling the plaintiff "Che Guevara" and an "aggressive Hispanic" did not constitute a hostile work environment. *Vallecillo v. U.S. Dep't HUD*, 155 F.App'x 764, 767 (5th Cir. 2005) (unpublished). The court reasoned that even if "these statements can be classified as racially offensive, they are not sufficiently severe or pervasive to constitute a hostile work environment." *Id.* Rather, "[t]he two statements related to race and national origin epitomize the type of utterances, epithets, and offhand comments that we have repeatedly stated were beyond Title VII's purview." *Id.*

Reviewing the evidence on this claim, the Court concludes, as a matter of law, that the facts cannot support a hostile work environment claim. It is obvious from the evidence that there was tension in Munoz's workplace, and that there were groups of employees who did not get along with each other.[7] There is no question that Munoz's subjective perception is that she was treated badly because of her race and her age. An objective view of the evidence, however, demonstrates that the environment was not similar to those in which a hostile environment has been found. As the Supreme Court noted in *Faragher*, in making this objective analysis, the court is to look at "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." 524 U.S. at 787–88. The events detailed in the

---

[7]Indeed, the evidence suggests that Czaja eventually left the Hospital, according to Hartmann, because of the harassment from Bustamante and Munoz. Hartmann at 62:2–13. Lantz also left for the same reason. *Id.* at 65:4–12. So too did a Hispanic coworker, Sylvia De La Garza. *Id.* at 63:13–17. Cates, the Hospital's HR representative, corroborated that the women left because of Munoz and Bustamante. Cates at 62:2–5.

16

evidence were infrequent and cannot be described as "severe." There is no evidence of physically threatening or humiliating conduct. Indeed, the most offensive comments (*e.g.*, Klinsiek's use of the term "wetback") were not made to Munoz, or even in her presence. She only learned about the comment in the course of discovery in this case. The only offensive comment that was made to Munoz was Klinsiek's reference to her as "Mexican." The Court agrees that a United States citizen of Hispanic descent could find this reference offensive. But this statement is best characterized as a "mere offensive utterance," and it is notable that Klinsiek was made to apologize for the comment.

Indeed, the evidence indicates that the Hospital did not foster, condone, or permit racial slurs. After Klinsiek used the term "wetback," she was immediately reprimanded and received a final written report. Hartmann at 119:11–120:10. When the Hospital learned of coworkers making comments about people smelling or how they should go work at McDonald's, the supervisors investigated and took action. *Id.* at 116:23–125:25.

Much of the evidence on which Munoz relies is best described as trivial. The event involving the sugar packets in the break room, and the receptionist who would tease or joke with children with ice cream stickers, are such minor events that they cannot possibly support a claim of a hostile environment. The same can be said of there being a document open on another computer that prevented Munoz from accessing it. Only the most serious, pervasive environments will be found to violate Title VII; otherwise the statute would "become a general civility code." *Faragher*, 524 U.S. at 788 (citation omitted).

Even considering the disciplinary actions as part of the hostile environment claim does not rescue the claim from summary judgment. As detailed in the factual section, when the incidents are viewed objectively, in light of all the summary judgment evidence, it appears that the managers were dealing with a tense office with employees who were not getting along, and the decisions to reprimand or counsel Munoz cannot be considered severe conduct intended to create a hostile environment. Indeed, the facts suggest that she was treated similarly to (but less harshly than) at least one other, Anglo, employee.

Considering <u>all</u> of the evidence, and taking all of that evidence in the light most favorable to Munoz, Munoz has failed to demonstrate that she was subjected to sufficiently severe or pervasive remarks or conduct such that it altered the conditions of her employment and created an abusive working environment.[8]  For these reasons, Munoz has failed to establish a prima facie case of a hostile work environment.

**B.      Disciplinary Disparate Treatment Claim**

Munoz also alleges that the Hospital discriminated against her by providing leniency to her coworkers who violated policies, without extending the same benefit to her. The primary argument here relates to how Klinsiek was treated when she made the reference to "people smelling" after a final written warning, as compared to how Munoz was treated when she was suspended and given a written reprimand.

"Punitive action against employees for violating work rules must not differentiate on the basis of . . . any of the . . . criteria reprobated by Title VII."  *McDonald v. Santa Fe Trail Transp.*

---

[8]Munoz's claim that she monitored in a hostile manner is not borne out by the facts.  The undisputed evidence demonstrates that the logging policy applied to all employees, and not only to Munoz.

*Co.*, 427 U.S. 273, 282–83 (1976).  To maintain her claim, Plaintiff must satisfy the four part test from *Brown v. A.J. Gerrard Mfg. Co.*, 643 F.2d 273, 276 (5th Cir. 1981): (1) Plaintiff was a member of a protected class; (2) there was a company policy or practice concerning the activity for which he or she was discharged; (3) non-minority employees were either given the benefit of a lenient company practice or not held to compliance with a strict company policy; and (4) the minority employee was disciplined either without the application of a lenient policy or in conformity with the strict one.

To begin, comparing the events surrounding Klinsiek's conduct with those surrounding Munoz's is not an apples-to-apples comparison.  Klinsiek was reprimanded, and given a final warning, for making racially derogatory remarks.  Munoz contends that she should have been fired when she referred to people in a waiting area smelling.  As noted above, the facts were investigated, and the supervisor concluded, based on information from several witnesses, that the comment was not what Munoz contends it was.  Thus, she was not disciplined.  Munoz, on the other hand, was reprimanded for the manner in which she was interacting with coworkers.  The actions taken were directed toward the problem, and she too was given a final warning that if her conduct continued she could be terminated.  In essence, Munoz's counsel contends that the supervisor viewed being bossy as worse than being racist, but the facts simply do not support this conclusion.[9]    Finally, as

---

[9]In her brief, counsel states that "Porter believes making racial remarks is not as bad as being perceived as bossy," and then cites to Porter's deposition for this statement.  In fact, the testimony demonstrates exactly the opposite.  When asked the direct question whether "using the word wetback or some other racial slurs is not as bad as someone perceiving you as bossy; is that your testimony?"  Porter answered "No."  Porter, 138:24–139:2.  This mis-citing of testimony casts doubt on the credibility of counsel's other citations to the record and is highly inappropriate.

noted in the factual section, the evidence demonstrates that an Anglo employee was actually terminated for conduct similar to that for which Munoz was reprimanded.

Thus, the evidence fails to support a prima facie case of disparate treatment in discipline, and summary judgment is appropriate on this claim.

## C.    The Retaliation Claim

Munoz also claims that the Hospital retaliated against her after she filed her EEOC charge when it gave her a poor evaluation in early 2009.[10]   The anti-retaliation provision of Title VII, 42 U.S.C. § 2000e-3(a), is broader than the discrimination provision of Title VII, but Plaintiff must still "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."   *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 68 (2006) (citations omitted).

As noted in the factual section, in her evaluation for 2008 (delivered in January 2009), Munoz apparently[11] received constructive criticism for the manner in which she interacted with her coworkers, related to the incidents already discussed above.   She was also counseled to try to be more professional in her emails.   It is difficult to accept Munoz's characterization of the evaluation as "negative," as she received a 2.5% merit raise.   Viewing these events objectively, one evaluation

_____

[10]In her brief, Munoz points to two other events in support of the retaliation claim, relating to the disputes she had with Lantz and Czaja.  The EEOC charge itself discusses these events, and they took place before she filed the EEOC charge in October.  As they pre-date the filing of the charge, they could not possibly have been acts of retaliation for the filing of the charge.

[11]The Court uses the term "apparently" because the full evaluation is not part of the record, and the two pages that are in the record do not contain the relevant language.  What is discussed here is based on Munoz's testimony in her deposition.

containing constructive criticism, and giving a 2.5% raise, is not something that would dissuade a reasonable employee from engaging in protected activity. Indeed, the Fifth Circuit has held that a low performance evaluation is not an adverse employment action. *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 373 n.11 (5th Cir. 1998). Summary judgment is appropriate on this claim.

**D.     Failure to Promote or Transfer Claims**

Munoz complains of two specific incidents where she was not promoted and two where she was not transferred, all allegedly because of her race or age. Unlike her claim of continuing violations for a hostile work environment, a failure to promote or transfer is a discrete incident. In her EEOC complaint, Munoz makes no mention of either a failure to promote or a failure to transfer.

A Title VII plaintiff must exhaust her administrative remedies by filing a charge with the EEOC before filing suit in federal court. *See* 42 U.S.C. § 2000e-5(f)(1) (2006); *Barnes v. Levitt*, 118 F.3d 404, 408 (5th Cir. 1997), *cert. denied*, 523 U.S. 1136 (1998). A failure to exhaust these administrative remedies deprives the court of jurisdiction over the claims. *Barnes*, 118 F.3d at 408; *National Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698, 711 (5th Cir. 1994). As noted earlier with regard to the hostile environment claim, there is some leeway with regard to the specificity required of a charge of discrimination. But Munoz's complete failure to allege that she was not promoted or transferred as part of her charge dooms these claims. This is not an instance where the Court can say that the claim of a discriminatory failure to promote is sufficiently similar to the allegations contained in the complaint such that it put the Hospital on notice of the claim. As just mentioned, a failure to exhaust deprives the Court of jurisdiction.

21

*Barnes*, 118 F.3d at 408.  Accordingly, the Court lacks jurisdiction to consider the claims of failure to promote or transfer, and summary judgment is appropriate on these claims.[12]

**E.      The Intentional Infliction of Emotional Distress Claim**

Munoz's final claim is her state tort claim complaining that the Hospital intentionally inflicted emotional distress upon her.  For this claim, she relies on the very same facts that support her statutory claims.  In *Standard Fruit and Vegetable Co. v. Johnson*, 985 S.W.2d 62, 68 (Tex. 1998), the Texas Supreme Court recognized that an IIED claim is "a 'gap-filler' tort, judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress."  In *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004),  the Court further elaborated that:

> The tort's clear purpose . . . was to supplement existing forms of recovery by providing a cause of action for egregious conduct that might otherwise go unremedied. . . .  In creating the new tort, we never intended that it be used to evade legislatively-imposed limitations on statutory claims or to supplant existing common law remedies. Properly cabined, the tort simply has no application when the actor intends to invade some other legally protected interest, even if emotional distress results. Where the gravamen of a plaintiff's complaint is really another tort, intentional infliction of emotional distress should not be available.

---

[12]There are other notable defects with these claims.  For the transfers, Munoz has failed to demonstrate that the failure to transfer is actionable.   Under both Title VII and section 1981 principles, "an employment action that 'does not affect job duties, compensation, or benefits' is not an adverse employment action."  *Pegram*, 361 F.3d at 282.  It is undisputed that the lateral positions did not have substantially different pay or duties.  With regard to the failure to be considered for the office manager position, it is undisputed that Munoz never applied for the position, and she also fails to offer any evidence that she was better qualified than the two persons who were placed in the position.  Finally, to the extent that Plaintiff complains about not receiving a raise when she was made a Patient Account Representative in 2003, this claim is time barred because Munoz did not file an EEOC complaint regarding it within 300 days.

(citations omitted).  Thus, in *Hoffmann-La Roche* the Court held that the plaintiff could not pursue both an IIED claim and a sexual harassment claim under the Texas Commission on Human Rights Act ("TCHRA") against her former employer since the "CHRA provides a remedy for the same emotional damages caused by essentially the same actions, there is no remedial gap in this case and thus no support for the award of damages under the intentional-infliction claim." *Id.* at 450. Because Munoz relies on the same facts for the IIED claim as she cites in support of her Title VII claims, the IIED claim is filling no gap and is not an available remedy under Texas law.

## III.  RECOMMENDATION

For the reasons set forth above, the undersigned Magistrate Judge RECOMMENDS that the Defendant's Motion for Summary Judgment (Clerk's Doc. No. 17) be GRANTED as to all claims.

## IV. OBJECTIONS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections. *Battles v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within 14 days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *See* 28 U.S.C. § 636(b)(1)(C);  *Thomas v. Arn*, 474 U.S. 140, 150-153, 106 S. Ct. 466, 472-74 (1985); *Douglass v. United Servs. Auto. Assoc.*, 79 F.3d 1415, 1428-29 (5th Cir. en banc, 1996).

To the extent that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 21st day of September, 2010.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE